975 F.2d 35
 Alberto OSPINA, deceased, by his executors, Thomas C.
Coughlin, Margoth Ospina and Tamara Ospina,
Plaintiff-Appellee,
v.
TRANS WORLD AIRLINES, INC., Defendant-Appellant,
Frigitronics Inc., Intervenor.
Mohsen YOUSSEF, Plaintiff-Appellee,
v.
TRANS WORLD AIRLINES, INC., Defendant-Appellant,
Frigitronics Inc., Intervenor.
 Nos. 1134, 1155, Dockets 91-9245, 91-9247.
 United States Court of Appeals,
Second Circuit.
 Argued May 21, 1992.
Decided Sept. 3, 1992.
 
 John N. Romans, New York City (Michael J. Crofton, Lawrence S. Rosen, Joan E. Lambert, Katten Muchin & Zavis, of counsel), for appellant TWA.
 Fredric Lewis, New York City, for appellee Estate of Alberto Ospina.
 Nicholas Gilman, Washington, D.C. (Gilman, Olson & Pangia, of counsel), for appellee Mohsen Youssef.
 Before: MESKILL, Chief Judge, PRATT, Circuit Judge, and NICKERSON,* District Judge.
 MESKILL, Chief Judge:
 
 
 1
 This case involves the precautions that airlines must take in order to receive the shelter from liability that the Warsaw Convention provides to carriers in all cases except those involving willful misconduct, see 49 U.S.C.App. § 1502 note. Trans World Airlines, Inc. (TWA) argues that insufficient evidence existed to support the jury's finding of willful misconduct. We agree with TWA and reverse the district court's denial of TWA's motions to set aside the verdicts.
 
 BACKGROUND
 
 2
 As TWA Flight 840 approached the Athens airport on April 2, 1986, a bomb exploded, killing four passengers and injuring others. Although the bomb created a large hole in the fuselage, the airplane landed safely. The Judicial Panel on Multidistrict Litigation consolidated the ensuing suits, which were referred to the United States District Court for the Eastern District of New York, Weinstein, J. All of the suits settled, with the exception of the two now before this Court on appeal. Plaintiff Youssef, who was seated some distance from the explosion, suffered injuries. Plaintiff Ospina, who was seated near the bomb, was blown out of the airplane and died. Both actions seek damages from TWA. After a bifurcated trial, judgments were entered in plaintiffs' favor.
 
 
 3
 The importance of the information in this case to the security and safety of commercial airlines and their passengers requires extraordinary treatment. Prior to the commencement of the liability phases of the proceeding below, the United States made a limited appearance in the action for the purpose of expressing its concerns about the disclosure, discussion and evaluation of airline security materials. So as not to jeopardize the safety of the traveling public, the district court ordered that the trial be closed to the public at such times as sensitive, anti-terrorist airline security information was to be disclosed, discussed or evaluated. Although the press had the right to review daily copy of the trial transcript, the United States received an initial opportunity to redact those portions of the transcript containing sensitive airline security information. At the conclusion of the trial, some exhibits were made available to the public while others--namely, those concerning sensitive information--were filed under seal.
 
 
 4
 The jury returned verdicts in plaintiffs' favor. The district court refused to set aside the verdicts or to grant a new trial. 778 F.Supp. 625 In rejecting TWA's motions, the district court did not reveal those facts on which liability rested. Instead, it stated that "[i]t is enough to say that the jury verdicts, finding TWA's delicts the equivalent of willful misconduct, were more than justified." Thereafter, prior to our hearing of this appeal, TWA moved this Court for an order requiring that appendices and briefs in these appeals be filed under seal. We granted the motion.
 
 DISCUSSION
 
 5
 The parties agree that the Warsaw Convention, a multilateral treaty governing the international carriage of passengers, baggage and cargo by air, see Chan v. Korean Air Lines, 490 U.S. 122, 123-24, 109 S.Ct. 1676, 1678-79, 104 L.Ed.2d 113 (1989), governs this case. The Convention's overriding purpose was "to limit air carriers' potential liability in the event of accidents." In re Air Disaster at Lockerbie, Scotland, 928 F.2d 1267, 1270 (2d Cir.) (citations omitted), cert. denied, --- U.S. ----, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). Toward this end, Article 17 of the Convention, as modified by the Montreal Agreement, limits carrier liability to $75,000 per claimant. See 928 F.2d at 1280. However, Article 25 of the Convention provides that a plaintiff may recover compensatory damages if he can show that the carrier engaged in willful misconduct.[1]
 
 
 6
 Plaintiffs' theory at trial was that TWA wrongfully neglected to perform certain acts that could have prevented the bombing. To be held culpable for willful misconduct in a case based on an omission, the defendant "must either have known that [the omitted act] was necessary for safety, or his duty to [perform the omitted act] must have been so obvious that in failing to [perform] it his conduct would be reckless, rather than negligent." Pekelis v. Transcontinental & Western Air, 187 F.2d 122, 125 (2d Cir.) (footnote omitted), cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951). Thus, plaintiffs needed to show that TWA omitted to do an act (1) with knowledge that the omission of that act probably would result in damage or injury, or (2) in a manner that implied a reckless disregard of the probable consequences. See Republic Nat'l Bank of New York v. Eastern Airlines, 815 F.2d 232, 238-39 (2d Cir.1987). A lesser standard would undermine the purpose of the Convention and would contradict Article 25(1)'s plain language.
 
 
 7
 TWA argues that a reasonable jury could not have found "willful misconduct" in this case. In reviewing the verdict to determine if it could have been produced by a reasonable jury, we view the evidence in the light most favorable to the non-moving parties and give them the benefit of all inferences that the evidence supports. See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962).
 
 
 8
 TWA stresses that it complied with Federal Aviation Administration (FAA) procedures and the laws of each country in which it operated. Plaintiffs counter by pointing to a threat that existed on Flight 840 and by emphasizing certain acts not performed by TWA that they claim TWA should have performed, which acts, plaintiffs claim, might have led to detection of the bomb that caused their injuries. In making this argument, plaintiffs emphasize that the FAA required airlines thoroughly to search the cabin and cockpit areas of airplanes to eliminate any hidden weapons, and that TWA failed to utilize two procedures which, although not specifically required by the FAA, would have uncovered the bomb that exploded on Flight 840.
 
 
 9
 As it did below, this case turns on whether plaintiffs introduced sufficient evidence to support the jury's verdict in plaintiffs' favor, a necessarily fact-specific inquiry. However, due to the unusual circumstances of this case, a detailed explanation of the probity of the record evidence might, in the wrong hands, endanger the traveling public. Having reviewed the record, we do not believe that a reasonable jury could have concluded that TWA's acts and omissions constituted willful misconduct. TWA's failure to take certain measures in searching the cabin--which defendants stress and plaintiffs apparently concede no airline regularly employed at that time--did not provide evidence of willful misconduct. Moreover, none of TWA's other acts or omissions violated a specific FAA requirement, and each of TWA's acts complied with all positive FAA safety procedures and regulations as well as the laws of the countries in which TWA operated. Nor do we believe that a reasonable jury could have concluded, based on the record in this case, that a specific threat existed that was sufficient to raise to the level of willful misconduct TWA's failure to employ the security measures pointed out by plaintiffs. Of course, if TWA had searched the place where the bomb was hidden, the bomb would have been discovered. That would be true in any case involving a hidden bomb. However, the test for willful misconduct is not 20-20 hindsight.
 
 CONCLUSION
 
 10
 The parties raise a number of other issues that do not affect our decision, and we need not reach them. The judgment of the district court is reversed.
 
 NICKERSON, District Judge, dissenting:
 
 11
 In my opinion these cases present not just an issue of whether there was sufficient evidence to support the jury verdict, but also an important question of law which has serious implications for the safety of passengers on United States international air carriers.
 
 
 12
 That question of law is whether such a carrier should receive shelter from liability under the Warsaw Convention if it deliberately and willfully abandons procedures for screening passengers that it had agreed with the United States government to follow, and indeed had considered essential and had followed for many years.
 
 
 13
 The District Judge concluded that "the jury verdicts, finding TWA's delicts the equivalent of willful misconduct, were more than justified," and that the terrorist "was allowed aboard in flagrant violation of many basic security measures."
 
 
 14
 Because of a concern that if hijackers learned of the security arrangements at the Cairo Airport and on the TWA aircraft they would be able to circumvent them, the District Court excluded the public and the press during those portions of the trial where the testimony related to "sensitive airline security information." Those portions remain sealed, and this opinion does not refer to them. I here discuss only that evidence which the District Court did not consider sensitive. In a supplemental dissenting opinion filed under seal I mention certain sealed matters pertinent to the issues.
 
 
 15
 TWA's willful misconduct did not consist merely of the neglect to use certain search procedures on the aircraft. Of the flagrant violations of security measures mentioned by the District Court, I will address here only one.
 
 
 16
 Although the terrorist was a "profile selectee" requiring careful screening, TWA allowed her aboard after deliberately deciding not to enforce a screening requirement agreed upon by the United States government and TWA. That requirement was for "redundant screening" by TWA itself, not by Egyptian personnel, of all passengers (not just profile selectees).
 
 
 17
 The testimony of Billie H. Vincent makes clear that there was such a requirement. Vincent was no ordinary citizen. He had spent almost thirty years in the Federal Aviation Administration (FAA) and since 1982 had been its director of the Office of Civil Aviation Security, retiring only a few months after April 2, 1986, the date of the incident at issue.
 
 
 18
 Under Egyptian law, only Egyptian authorities were permitted to search physically passengers at the Cairo Airport. But as Vincent testified, "as a result of the determination by TWA and the U.S. government" that the local "security was inadequate" at Cairo, there was put in effect some years before 1986 a requirement for United States air carriers to conduct redundant screening in Cairo of all passengers, not just profile selectees.
 
 
 19
 According to Vincent it was "clearly understood" between himself and the TWA officials that the redundant screening by TWA "had to continue." Although the requirement for such screening was not formalized as a regulation, TWA recognized it as essential and in fact continued it over the years.
 
 
 20
 Quite plainly the requirement was implemented and continued because TWA and the United States government regarded the inspection by Egyptian personnel as insufficiently trustworthy to assure the safety of the passengers and crew. By April 2, 1986, the requirement was still in effect, and in fact had assumed added significance due to increased terrorist activities in the Middle East and elsewhere.
 
 
 21
 But on the day of this incident TWA, acting through its agents, knowingly and deliberately decided to abandon that requirement. TWA did this even though it knew that the woman was no ordinary passenger but a "profile selectee" posing a special risk.
 
 
 22
 TWA took the profile selectee to the gate at which it was equipped to do its own "redundant screening." But the gate was closed. TWA did not ask the Egyptians to reopen it. Nor did TWA tell the profile selectee that she could not leave on the flight because TWA was unable to screen her in time. Instead, evidently in haste to add one more passenger to the manifest, the TWA agent went with her to a gate where TWA was unequipped to supplement the screening by Egyptians with its own, more reliable procedures. The Egyptians took her into a private booth for screening. No one testified as to exactly what was said or what happened in that booth, or as to the extent, if at all, that the Egyptians searched her or her handbag. She was then allowed by TWA to board the airplane.
 
 
 23
 Some things are clear. TWA never electronically screened her carry-on bag or its lining. TWA did not check her person or bag with metal detecting hand wands. All this could and presumably would have been done if TWA had adhered to its established procedure agreed upon with the United States government and had taken her through the required redundant TWA screening. In turn, that redundant screening could presumably have detected the components for the bomb.
 
 
 24
 TWA's abandonment of an established screening procedure was not the result of inadvertence or negligence. It was a deliberate action made with full knowledge of the probable consequences. In a word, it was willful.
 
 
 25
 The fact that the requirement was not in writing does not diminish the significance of its abandonment. A written requirement may be easier to prove, but once it is proven the failure to follow a de facto requirement or procedure can rise to the level of willful misconduct. Cf. Republic Nat'l Bank of New York v. Eastern Airlines, 815 F.2d 232, 239-40 (2d Cir.1987) (no willful misconduct for failure to follow de facto procedures where evidence failed to prove that defendant adopted such procedures).
 
 
 26
 Redundant screening by TWA was not some unimportant matter instituted out of caprice or whim. Common sense suggests that it was implemented for some purpose. As evidenced by TWA's continuation of redundant screening over the years and by other information which remains under seal, it was not something that TWA regarded as trivial or cosmetic. TWA knew it had to rely on its own defenses.
 
 
 27
 There were reasons why the United States and TWA regarded the Egyptian security procedures as untrustworthy. I cannot describe in this unsealed opinion the evidence of those reasons. It is enough to say that the specifics now held secret fully justified that lack of trust.
 
 
 28
 No single person at TWA was aware of all of the circumstances of the boarding of the profile selectee. But the "willful misconduct" of TWA must be evaluated in light of the circumstances known to its employees, managers, and agents, collectively. At least one of those employees charged with responsibility for security made the decision to abandon the screening by TWA personnel and to leave the passengers at the mercy of Egyptian personnel known by TWA to be untrustworthy.
 
 
 29
 Although I cannot discuss the details in this unsealed opinion, the record shows that once TWA decided to abandon the requirement for redundant screening, TWA had no adequate procedures in place to repair the breach. This fact simply emphasizes the importance of TWA's pre-boarding screening.
 
 
 30
 I do not agree that the Warsaw Convention shelters TWA from liability when it willfully acts to abandon a screening procedure implemented by agreement with the United States government, a procedure that TWA knew under the agreement it "had to continue" and that TWA itself deemed essential.
 
 
 31
 I would therefore affirm the judgment of the district court.
 
 
 
 *
 Honorable Eugene H. Nickerson, United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 Article 25(1) provides as follows:
 The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his willful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.
 49 U.S.C.App. § 1502 note.