811 F.Supp. 84 (1992)
In re AIR DISASTER AT LOCKERBIE, SCOTLAND ON DECEMBER 21, 1988.
Judith A. PAGNUCCO, Individually and as Executrix of the Estate of Robert I. Pagnucco, deceased,
v.
PAN AMERICAN WORLD AIRWAYS, INC., Pan Am World Services, Inc., and Alert Management Systems, Inc., Defendants.
Dona Bardelli BAINBRIDGE, Individually and as Administratrix of the Estate of Harry M. Bainbridge, deceased,
v.
PAN AMERICAN WORLD AIRWAYS, INC., Pan Am World Services, Inc., and Alert Management Systems, Inc., Defendants.
Molena A. PORTER, Individually and as Administratrix of the Estate of Walter Leonard Porter, deceased, Plaintiffs,
v.
PAN AMERICAN WORLD AIRWAYS, INC., Pan Am World Services, Inc., and Alert Management Systems, Inc., Defendants.
M.D.L. No. 799 (TCP), Nos. 89-CV-0387 (TCP), 89-CV-0386 (TCP) and 89-CV-0337 (TCP).
United States District Court, E.D. New York.
November 2, 1992.
*85 Lee S. Kreindler, Steven R. Pounian, Kreindler & Kreindler, New York City, for plaintiffs.
James M. Shaughnessy, Windels, Marx, Davies & Ives, New York City, Richard M. Sharp, Frederick C. Schafrick, Eric C. Jeffrey, Shea & Gardner, DC, for defendant Alert Management Systems, Inc.

MEMORANDUM AND ORDER
PLATT, Chief Judge.
Defendant Alert Management Systems, Inc. ("Alert"), by counsel, has moved this Court for an Order granting judgment as a matter of law as to it pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is denied.

BACKGROUND
On December 21, 1988, Pan Am Flight 103 crashed near Lockerbie, Scotland; all 243 passengers and 16 crew members died. The surviving relatives and personal representatives of those who died sued Pan American World Airways, Inc., Pan Am World Services, Inc., and Alert Management Systems, Inc. (collectively "defendants"). On April 4, 1989, the Judicial Panel on Multidistrict Litigation consolidated all actions and transferred them to this Court. See In re Air Disaster at Lockerbie, *86 Scotland on December 21, 1988, 709 F.Supp. 231 (Jud.Pan.Mult.Lit.1989).
Over a period of 11 weeks in the spring and summer of 1992, a jury trial was conducted in the passenger actions to determine if defendants had engaged in wilful misconduct that was the proximate cause of the disaster.[1] At the close of plaintiffs' case and again at the close of all the evidence, defendant Alert moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Alert argued that plaintiffs had not offered sufficient evidence to allow a reasonable jury to conclude that Alert engaged in wilful misconduct that proximately caused the accident. This Court reserved judgment on Alert's latter motion and submitted the action to the jury. On July 10, 1992, the jury returned a verdict in favor of plaintiffs finding "Pan Am (including Alert)" had engaged in wilful misconduct and that such wilful misconduct was "a substantial factor in causing the disaster." Jury Verdict Form.
Alert now renews its motion for judgment as a matter of law pursuant to Rule 50(b), incorporating by reference its original written motion.[2]

DISCUSSION
This Court is convinced that Alert is not entitled to judgment as a matter of law because Alert concededly is a wholly owned subsidiary of Pan Am created to be responsible for conducting all security measures and procedures,[3] and contrary to Alert's contention, defense counsel made it abundantly clear to the jury that it was not to distinguish between the liability of Pan Am and Alert. Furthermore, plaintiffs presented substantial evidence at trial such that a reasonable jury would almost certainly have concluded that Alert, by itself, was also guilty of wilful misconduct that proximately caused the disaster.

A. Defense counsel treated Pan Am and Alert as a single entity.
Alert contends that as "agent of Pan American World Airways ... Alert's state of mind must be judged separately from Pan Am in determining whether Alert was guilty of `wilful misconduct' that caused the disaster." Memorandum of Defendant Alert in Support of Renewed Motion for Judgment as a Matter of Law (hereinafter "Memorandum in Support") at 3. However, a statement of defense counsel for both Pan Am and Alert at the opening of trial belies this contention. Defense counsel told the jury to treat Pan Am and Alert as "one":
Now technically these are two separate companies. Quite frankly, for your purposes, you can consider them one. We created Alert to help with the security, and as far as we're concerned and you should be concerned, I'm going to talk from now on about Pan Am, but Pan Am is responsible for Alert as it is for its own force.
(Tr. 64) (emphasis added).
The jury, this Court, and plaintiffs were entitled throughout the trial to rely upon this representation and admission by counsel. Counsel may not have it both ways. He may not claim Alert and Pan Am are *87 one and then, once the verdict is in, attempt to withdraw from this agreement and admission.
Alert argues that in this passage from counsel's opening statement, he was merely informing the jury of "the normal rules of agency law ... under which a principal is responsible for the wrongdoing of its agent." Reply Memorandum of Defendant Alert in Support of Renewed Motion for Judgment as a Matter of Law (hereinafter "Reply Memorandum") at 3. But if counsel was so concerned about treating Alert and Pan Am separately, he should not have taken the extra step and told the jury (as he did) to treat them as one.
Furthermore, even if Alert and Pan Am should have been and were considered separately by the jury, this Court knows of no principle of agency law that relieves an agent from liability for its own misconduct, and as demonstrated below, the jury heard substantial evidence of Alert's wilful misconduct.
Additionally, Alert may not try to distinguish itself from Pan Am when the special verdict form presented to the jury considered the two defendants as one. The special verdict form contained two questions:
(1) Did Pan Am (including Alert) engage in wilful misconduct? Yes ___ No ___.
(2) Was it a substantial factor in causing the disaster? Yes ___ No ___.
The jury answered "Yes" to both of these questions. (Tr. 6711).
To be sure, at the charge conference on July 6, 1992, and again on July 7, defense counsel submitted to the Court a proposed special jury interrogatory that distinguished between Pan Am and Alert. (Tr. 6323-24, 6328, 6581-91). But after the jury returned its verdict on July 10, this Court invited counsel for defendants to submit a supplemental interrogatory, and counsel declined the Court's invitation. (Tr. 6581-91, 6713). Thus, Alert waived its right to obtain the determination it now seeks and may not now claim prejudice from the absence of a separate finding against it.
Finally, if Alert and Pan Am truly intended to be treated separately, then it makes no sense to this Court why the same law firm represented both, given the manifest conflict of interest between Alert and Pan Am on the issue of which "entity" was responsible for the Lockerbie disaster. Indeed, it would have been clearly improper for the same law firm to represent both defendants in these circumstances.

B. The facts support a finding of Alert's liability.
Even if we were to assume that the jury understood it was judging Alert's state of mind separately from Pan Am's, Alert still is not entitled to judgment as a matter of law because, given the following evidence that was presented at trial, a reasonable jury would almost certainly have concluded that Alert was guilty of wilful misconduct that proximately caused the disaster:[4]
1. Trial testimony established that Pan Am utilized x-ray machines to detect potential security risks, such as a bomb. (Tr. 3451). Moreover, all interline baggage for Flight 103 was x-rayed. (Tr. 4744). Trial testimony also established that it was Alert's responsibility to operate the x-ray machines, such that Alert represented the last and only line of defense of Flight 103 against bags containing explosives. (Tr. 4744-45).
2. The jury listened to overwhelming evidence regarding Alert's failure to employ competently trained and well-informed personnel to operate the x-ray screeners. (Tr. 1802-22, 1421-24).[5] In particular, they *88 heard evidence regarding the improper training of Kurt Maier, the Alert employee who was operating the x-ray machine in Frankfurt and who allegedly overlooked the radio cassette player containing the bomb. (Tr. 827). Mr. Maier himself testified that before his employment by Alert on November 1, 1988, he had no security experience, and that he received no training from Alert except "on the job" training over a period of two to four days, consisting of random assistance by other Alert employees. (Tr. 6115-16, 6143).[6] Mr. Maier testified further that although he needed his glasses to discern fine detail, he was not wearing them while viewing objects through the x-ray machine on December 21, 1988. (Tr. 6108). Meanwhile, Anthony Cooke, an Alert employee in London, testified that Alert personnel should have had no difficulty recognizing on an x-ray screen a Toshiba radio cassette recorder, such as the one in which the bomb that destroyed Flight 103 was hidden. (Tr. 5231). In short, Alert, by reason of either Mr. Maier not being able to see clearly without his glasses, or not having been trained or advised to pull bags with Toshiba radios for physical inspection, was guilty of wilful misconduct that was a proximate cause of the accident.
3. Ulrich Franz Weber testified that Alert knowingly cooperated with Pan Am employees to disguise chronic understaffing and noncompliance with FAA regulations at Frankfurt whenever FAA inspections were expected so that they would not have to provide more security. (Tr. 1580-87).
4. The jury heard evidence that Alert's Frankfurt security director, Mr. Weber, received in early December a written warning from the FAA, known as the "Helsinki warning," that a bomb would be placed on board a Pan Am flight from Frankfurt to the United States, but that the only thing Weber did with the warning was place it on his desk, (Tr. 1350-63, 1378, 1389-90), and despite the warning, he never instructed personnel to examine all electronic devices that they observed through the x-ray process. (Tr. 6160). Moreover, several Alert employees, including Stella Schneider, testified that they watched as Weber backdated the Helsinki warning to suggest that it had been properly processed by Alert in Frankfurt. (Tr. 1350-63, 1378, 1389-90, 3146, 1416-21). Furthermore, Alert employees as high as the European director were advised of this backdating and attempted to conceal it. (Tr. 1350-58, 1361-63, 1378, 1389-90). This was evidence of consciousness of guilt on the part of Alert for its part in the wrongful causation of the crash.
5. Oliver Koch, an Alert employee who was responsible for advising personnel on how to respond to bomb threats, testified that had he seen the Helsinki warning before December 22, he would have increased personnel and tightened overall security. (Tr. 1377-82).
6. Mr. Koch testified further that in early November, 1988 he attended a presentation where German officials discussed how the Frankfurt police, during the arrest of suspected terrorists, discovered a Toshiba radio cassette player bomb designed to blow up an aircraft. (Tr. 1364-66). At the *89 presentation, the officials distributed photographs of the device, together with warnings of a threat to civil aviation. (Tr. 1364-66). Mr. Koch stated further that he did not discuss the substance of the warning with anyone at Alert, other than Mr. Weber, and he did not alter procedures to address it. (Tr. 1375-78).
7. Two expert witnesses, Billie Vincent and Rodney Wallis, testified that Alert screeners should have been examining all electronic devices in light of the Toshiba warning. (Tr. 3123-24, 3451, 3480-81). Moreover, Mr. Wallis testified that even a lay person could easily detect a radio cassette player within baggage that passed through an x-ray machine. (Tr. 765, 810).
In sum, after hearing this evidence and its role in contributing to the accident, reasonable and fair minded jurors would almost certainly have concluded that Alert intentionally ignored the warnings "with knowledge that [failure to respond to the warnings] probably would result in damage or injury." Ospina v. Trans World Airlines, Inc., 975 F.2d 35, 37 (2d Cir.1992).

CONCLUSION
Because counsel for Alert never explained to the jury that Alert's liability was to be judged separately from Pan Am's, and because the evidence against Alert on the issue of wilful misconduct that was a proximate cause of the accident was overwhelming, Alert's motion must be and the same hereby denied.
SO ORDERED.
NOTES
[1] The liability of carriers is limited to $75,000 per passenger under Article 22 of the Warsaw Convention as supplemented by the 1966 Montreal Agreement. Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000, T.S. 876 (1934), reprinted at note following 49 U.S.C.App. § 1502 (Warsaw Convention); Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, CAB Agreement 18900, note following 49 U.S.C.App. § 1502 (approved by CAB Order E-23680, May 13, 1966, 31 Fed.Reg. 7302) (Montreal Agreement). If, however, plaintiffs prove wilful misconduct, then the liability limits are inapplicable (Article 25).
[2] Alert renews its motion against three plaintiffs only  Pagnucco, Bainbridge, and Porter  because as of this date, damage trials have been held and judgments have been entered for these plaintiffs only.
[3] See Opening Statement of Clinton H. Coddington (Tr. 64) ("Now, about this same time in 1986 Pan Am created this company called Alert Management Systems. It was owned as part of Pan Am's corporate family and was wholly owned by a sister company called Pan Am World Services.").
[4] Under the Warsaw Convention, to prove wilful misconduct, plaintiffs must show that Alert intentionally failed to perform some act that allowed a bomb to be placed on board "(1) with knowledge that the omission of that act probably would result in damage or injury, or (2) in a manner that implied a reckless disregard of the probable consequences." Ospina v. Trans World Airlines, Inc., 975 F.2d 35, 37 (2d Cir. 1992). See also Republic Nat'l Bank of New York v. Eastern Airlines, Inc., 815 F.2d 232, 238-39 (2d Cir.1987).
[5] Alert attempts to evade this by arguing that plaintiffs' theory of causation focused on the decision to use x-ray procedures to inspect interline baggage in place of performing positive passenger-to-baggage matching and that the evidence showed that this decision was made by Pan Am, not by Alert. Memorandum in Support at 6. However, this argument does not suffice, for although the failure to perform passenger-baggage matching was a primary cause of the disaster, Alert's failure to employ competently trained and well-informed screeners also led to the disaster. A reasonable jury almost certainly would have found that proper x-ray screening, although inferior to passenger-baggage matching, would also have led to detection of the bomb.
[6] Alert argues that it was Pan Am, not Alert, that was to provide the training for Alert's x-ray operators, and therefore Alert cannot be held responsible for failing to train its own employees. Memorandum in Support at 7. The Court notes that at trial there was conflicting testimony about whether Pan Am or Alert was responsible for training Mr. Maier and other x-ray machine operators. What is clear, however, is that neither Alert nor Pan Am trained Mr. Maier and the other screeners. Thus, a reasonable jury could have concluded that both Pan Am and Alert breached their duty to provide properly trained personnel, and that Alert's wilful breach of that duty was a substantial contributing factor in the disaster.